## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**KINO CHRISTIAN**,

        Plaintiff,

v.

**CITY OF FLINT**, a political
subdivision of the State of Michigan; and,
**LEE ANN GASPAR**, Jointly and Severally,

        Defendants.

_____/

## <u>COMPLAINT</u>

        There is no other civil action pending between these parties arising out of the same transaction or occurrence as alleged in this Complaint.

        A civil action between Plaintiffs C'Quan Hinton, Dartanion Edwards, and Gina Edwards, as Personal Representative of the Estate of Joshun Edwards, and the above-named Defendants is currently pending in this Court and arises out of the same transactions and/or occurrences as alleged herein. *See, Hinton v. Lee Ann Gaspar, et al,* Case No. 24-cv-11603.

        */s/ Michael R. Dezsi*

NOW COMES Plaintiff, KINO CHRISTIAN, by and through his attorneys, MICHAEL R. DEZSI and TREVOR B. GARRISON, and for his Complaint against the above-named Defendants, states as follows:

## **INTRODUCTION**

1.      On October 9, 2007, fourteen-year-old Robert Person was shot and killed near the south side of Flint.

2.      On the day of his murder, Person allegedly befriended another teenager, Jarylle Murphy, whose testimony provided the main account of the events of that day.

3.      Despite having alibi witnesses and being in a different location at the time of the shooting, Murphy identified Kino Christian ("Christian") as being present when the shooting occurred.

4.      During trial, Murphy testified he was able to see the four assailants because they were walking under a streetlight.

5.      In truth, Murphy informed Sergeant Lee Ann Gaspar months before that he could "not really" see the shooters, further stating, "it was kinda dark."

6.      As pled throughout this Complaint, Sergeant Gaspar suppressed Murphy's statement that he never saw Christian and/or fabricated other statements to convict Christian.

2

7.      Christian was found guilty by a jury of first-degree murder on February 17, 2009.

8.      Sergeant Gaspar withheld *Brady* material from the prosecutor and Christian's defense attorney. That evidence was exculpatory; if she had disclosed it, Christian would not have been convicted.

9.      On March 31, 2009, Christian was sentenced to life in prison without parole.

10.     As a result of the Defendants' actions and inactions, Christian was wrongfully incarcerated in jail and prison from November 9, 2007, to December 22, 2022,  or 15 years, 1 month, and 14 days.

11.     This is a cause of action under 42 U.S.C. §§ 1983 and 1988 for violating Christian's Constitutional rights.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983.

13.     The amount in controversy exceeds Seventy-Five Thousand ($75,000.00) Dollars, excluding interest and costs.

14.     This Court has personal jurisdiction over the named Defendants because they either reside in Michigan or do systematic and continuous business in Michigan.

15.     This Court has supplemental jurisdiction over the state law claim under 28 U.S.C. § 1367(a) because it is so related to the other claims in the action such that it forms part of the same case or controversy.

16.     Venue lies in the Eastern District of Michigan, Southern Division, pursuant to 28 U.S.C. § 1391(b) because the events supporting Plaintiff's allegations occurred in this district and because the Defendants reside there.

## THE PARTIES

### A.     Plaintiff

17.     Plaintiff, KINO CHRISTIAN, is a resident of Genesee County in the State of Michigan.

### B.     Defendant City of Flint

18.     Defendant, CITY OF FLINT, is a political subdivision of the State of Michigan duly organized to carry out governmental functions under the laws of Michigan, one of the functions being to create and implement policies and practices, and to organize, operate, staff, and supervise its police officers.

### C.     Defendant Lee Ann Gaspar

19.     Defendant, LEE ANN GASPAR, was employed by the City of Flint as a police officer, detective, and sergeant. Gaspar resided in Genesee County, State of Michigan, and was an officer in charge of the homicide investigation. Gaspar was acting under color of state law during the period in question.

## FACTUAL ALLEGATIONS

20.     On October 9, 2007, fourteen-year-old Robert Person was shot and killed while riding a bike near South Averill Avenue and Lippincott Boulevard just outside of Flint, Michigan.

21.     Gaspar and the City of Flint Police Department investigated the homicide.

22.     Kino Christian, Joshun Edwards, C'Quan Hinton, and Dartanion Edwards were eventually charged with the murder.

23.     Under Gaspar's direction, the police recovered 35 shell casings from the crime scene and conducted DNA analysis on just two of them.

24.     None of the DNA profiles belonging to Christian, Edwards, Hinton, or Edwards were present. However, the DNA profiles of three unknown males were identified.

25.     After the shooting, the police saw a car near the scene with a bullet hole in its side and subsequently had a conversation with the driver of the car, Ashlie Dye.

26.     Dye told the police that she saw Person alone on a bike at the time of the shooting.

27.     The police also spoke with Anthony Williams, a close friend of Person. Williams told the police he was with Person all afternoon and evening.

28.    After playing football at the Evergreen Regency Apartments, situated at the southwest corner of the intersection where Person was shot, Williams, Person, and two girls went to a nearby store together.

29.    On their way to the store, a gray van approached them. On their return from the store, the van began to follow them, and Person told Williams to leave with the girls because something bad was going to happen. Shortly after Person told Williams to leave, Williams walked away with the girls and heard gunshots.

30.    There is no record of the police locating the girls or trying to speak to them.

31.    On October 16, 2007, approximately one week after the shooting, Gaspar interviewed fifteen-year-old Jarylle Murphy who told a different story.

32.    Notably, Murphy came prepared with a piece of paper encompassing comprehensive descriptions of four individuals he claimed were the shooters. To illustrate, he provided explicit details about one of the shooters, describing him as 5'11 to 6'0, with dark skin, black hair in long braids, a goatee, both ears pierced, donning gray Dickies pants, a black shirt, black Jordan shoes, a do-rag, and a black and gray hat.

33.    Murphy also supplemented his account with a visual depiction, showing the positioning of the four shooters and a description of the firearms they allegedly carried: two handguns, one AK-47, and one TEC-9.

34.     Importantly, Gaspar's October 16, 2007 interview of Murphy was contemporaneously transcribed, and when asked directly whether he could see the shooters, Murphy said, "Not really, it was kinda dark."

35.     However, Gaspar suppressed the transcript of Murphy's October 16, 2017 interview, and neither Christian nor his co-defendants knew about it.

36.     What is worse, Gaspar condensed her October 16, 2007 interview of Murphy into a police narrative report.  In that summary, Gaspar mispresented facts, fabricated others, and omitted Murphy's statement that he could "not really" see the shooters.

37.     Murphy arrived at the police station with a detailed written description of the four shooters down to the color and brand of their shoes and the guns they carried, and yet told the police that he could not get a good look at them because it was "kinda dark," they were approached from behind, and the interaction happened in a matter of seconds. The police narrative reports do not say whether officers questioned Murphy about how he generated such a detailed description of the four men.

38.     In truth, Murphy never saw the shooting, as Gasper very well knew. The descriptions of the shooters and the drawing he created were done the night before Gaspar interviewed him, under Gaspar's guidance, with Gaspar providing him with the details to include.

39.     Murphy's version of the shooting, a version concocted by Gaspar, contradicted Williams's version in several ways. Yet, there is no indication that Gaspar asked Murphy about Williams, or asked Williams about Murphy, or whether she spoke to Williams again before the trial.

40.     Gaspar interviewed Murphy again on November 8, 2007. This time Murphy provided different information about the shooting than in his first interview. Like the October interview, the November interview was transcribed.

41.     Before the trial, Gaspar produced the transcript of the November interview to defense attorneys but deliberately withheld the transcript of Murphy's October interview. Instead, Gaspar presented an incomplete and fictitious summary of Murphy's October interview.

42.     Gaspar's summary excluded important details from Murphy's October interview. For example,

a.  Gaspar omitted Murphy's October statement that one of the shooters was on a bicycle and Person was not riding a bicycle;

b.  Gaspar omitted Murphy's October statement that a girl was with them when the shooting happened;

c.  Gaspar omitted Murphy's October statement that they were sitting on the sidewalk at the time of the shooting;

d.  Gaspar omitted Murphy's October statement that he could not see the shooters because it was "kinda dark"; and,

e.  Gaspar omitted Murphy's October statement that he fled to the middle of the Evergreen Regency Apartments after shots

were fired.

43.    In her summary, Gaspar manipulated the evidence by presenting Murphy's October statements as if they were in line with his November statements when they were not. For example,

> a. Gaspar misstated Murphy's timeline by claiming Murphy said the shooting happened at 8:00 p.m., which is what he said in November—but not what he said in October, which was 9:00 p.m. or 9:30 p.m.; and,

> b. Gaspar falsely claimed that Murphy told her that one of the men accused Person of snitching on a brother, which is what he said in November—but not what he said in October, which was that one of the men accused Person of snitching on his mom.

44.    Gaspar fabricated evidence, withheld evidence, and coached Murphy in other ways. For example,

> a. The suppressed transcript reveals that Murphy told Gaspar that he boarded a bus to South Flint at 6:30 p.m. and that the shooting took place around 9:00 p.m. or 9:30 p.m. Testimony of other witnesses, including Xavier Regimbal, the security guard patrolling the Evergreen Regency Apartments that night, made clear that the shooting happened around 8:00 p.m., as Murphy himself would later say in his November interview and preliminary examination testimony. Neither the defense attorneys nor the jury learned about this change in Murphy's story because Gaspar changed the details. Gaspar falsely stated that Murphy reported that the shooting took place at 8:00 p.m. Gaspar fabricated the evidence because she knew that Murphy's statement that he did not board the bus to South Flint with his sister until 6:30 p.m. would have made it impossible for him to be present at the shooting by 8:00 p.m. Since Murphy never again mentioned boarding the bus at 6:30 p.m., and that fact did not appear in Gaspar's summary

of the October interview, Christian's defense attorney could not question Murphy on how he would have been able to be present at the crime scene when it happened.

b.  The suppressed transcript reveals that Murphy said that one of the men accused Person of snitching on his mom—unlike his later accounts, where he says one of the men accused Person of snitching on his brother. The jury never knew about this inconsistency because Gaspar altered the fact to make it consistent with Murphy's revised story.

c.  The suppressed transcript reveals that Murphy never mentioned Person getting a phone charger and bike from a Dodge van during the October interview. Those details first emerged in his November interview and remained consistent when he testified. However, because Christian only had the summary, the jury never found out that Murphy had never mentioned the van in his original interview.

d.  The suppressed transcript reveals that Murphy claimed that the girl was still with him and Person when the shooting happened, unlike his later statement and trial testimony that the girl had left before Person was killed. The jury never learned about this change in Murphy's story either because Gaspar omitted this detail in her summary.

e.  The suppressed transcript reveals that in October, Murphy was adamant that one of the shooters, not Person, was on a bike; he stuck to this story even when asked multiple times. By the time of his November interview, Murphy said that Person was on a bicycle at the time of the shooting, which is what Murphy also told the jury. But the jury never learned that Murphy's story changed in this crucial way because Gaspar's misleading summary omitted this inconsistency too.

f.  The suppressed transcript reveals that Murphy claimed he and Person were sitting down when the shooters approached. In his November interview he said they were walking at the time, and he told the jury that as well. The jury never knew about this change of story either. Gaspar omitted it from her

summary.

g. The suppressed transcript reveals that Murphy did not express confidence in his ability to see the shooters because it was "kinda dark." He told the jury, however, that he was confident that Christian and/or his co-defendants shot Person. Christian's defense attorney challenged Murphy's ability to identify the shooters given the time of night and the fact that the shooters approached from behind. But his challenge would have been more convincing if he had known that when Murphy first spoke to Gaspar, he had told her he was not confident he could identify the assailants. The jury never learned that fact because Gaspar concealed it.

h. The suppressed transcript reveals that Murphy claimed that as shots were fired he ran into the middle of the Evergreen Regency complex, which is at the intersection where Person was killed. But he told the jury that he ran about a mile due west of the shooting, just as he had at the preliminary examination. The jury never learned about this story change either. Once again, Gaspar omitted it.

45.    Murphy's version of events was inconsistent with the physical evidence. In Gaspar's suppressed interview, Murphy claimed that Person did not have a bike. But the bike was discovered right by Person's body, suggesting he had been riding or walking it when he was shot.

46.    Gaspar fabricated the time of the shooting, the motive for the shooting, whether Person obtained a phone charger and bicycle from four girls in a van, whether the girl was still with Murphy and Person during the shooting, who had a bicycle during the shooting, where Person and Murphy were located during the shooting, how well Murphy could see the shooters, and where Murphy ran after the

shooting.

47.    Had Gaspar not suppressed Murphy's October interview, probable cause would have been lacking.

48.    There is a reasonable probability that had the October transcript been disclosed to the defense, the result of the proceeding would have been different.

49.    Gaspar attempted to fabricate evidence in other ways. When Gaspar interviewed a man named William Harris, for example, she corruptly enticed Harris to concoct a story about providing a gun to one of the shooters before Person's murder.

50.    The prosecutor gave Harris immunity to testify and expected Harris to testify at trial that he gave the gun to Christian's co-defendant Joshun Edwards. Instead, Harris denied it and explained that Gaspar, "put me in a position. She basically told me that I either would be a defendant or I would be a witness." He elaborated that the two of them "just sat there and concocted a story."

51.    Gaspar also manufactured part of her interview with Sinan Asmaro, who was working at the Ten Eleven Market the night of the shooting.

52.    In Gaspar's version of the interview, Asmaro told her that Person and another boy were making fun of Hinton, to which Hinton replied, "You better watch your back." But when Asmaro testified at trial, he told the jury the boys left the store laughing and smiling, explaining that it was "nothing serious" and that, "[i]t wasn't

words. It was more laughing."

53.     With manufactured evidence and the concealment of evidence, Christian and his co-defendants were found guilty of first-degree murder and other offenses on February 17, 2009. The men were sentenced to life in prison without parole.

54.     Years later, Joshun Edwards's family filed a Freedom of Information Act request seeking documents related to the case.

55.     One of the documents provided in response to the request was the October transcript of Gaspar's interview with Murphy, which had not been provided to the defendants, their attorneys, or the prosecuting attorney.

56.     Christian filed a Motion for Relief from Judgment, asserting the suppression of the transcript violated his constitutional right to exculpatory evidence and that the failure to provide it violated *Brady v. Maryland,* 373 U.S. 83, 83 S. Ct. 1194 (1963).

57.     After a lengthy appeal process, the Michigan Supreme Court agreed with Christian, finding that the transcript was suppressed, exculpatory, and material.

58.     On September 22, 2022, Christian's convictions were vacated.

59.     On December 22, 2022, the Genesee County Prosecutor's Office voluntarily dismissed all charges against him.

## COUNT I

### *Brady* Violations

**Against Gaspar
In Violation of the Fourteenth Amendment,
Cognizable Under 42 U.S.C. § 1983**

60.    Plaintiff restates and realleges the allegations contained in the above

paragraphs as though fully set forth herein.

61.    The Due Process Clause of the Fourteenth Amendment provides that

no state may, "deprive any person of life, liberty, or property, without due process

of law; nor deny to any person within its jurisdiction the equal protection of the

laws." U.S. Const. amend. XIV, § 1.

62.    Suppression of material evidence favorable to the accused violates due

process, irrespective of the good faith or bad faith of the prosecution. *Brady v.*

*Maryland,* 373 U.S. 83, S. Ct. 1194 (1963).

63.    At all times relevant, Gaspar withheld exculpatory or impeachment

evidence, including, but not limited to, the transcript of Gaspar's October 16, 2007

interview with Murphy.

64.    More specifically, the transcript of Gaspar's October 16, 2007

interview with Murphy contained the following exculpatory or impeachment

evidence:

> a. That Murphy did not board the bus to South Flint with his
>    sister until 6:30 p.m., which would have made it impossible

for him to be present at the shooting by 8:00 p.m.

b. That Murphy said that one of the men accused Person of snitching on his mom—unlike his later accounts, where he says one of the men accused Person of snitching on his brother.

c. That Murphy never mentioned Person getting a phone charger and bike from a Dodge van during the October interview.

d. That Murphy claimed that the girl was still with him and Person when the shooting happened, unlike his later statement and trial testimony that the girl had left before Person was killed.

e. That Murphy was adamant that one of the shooters, and not Person, was on a bike when Person was shot.

f. That Murphy initially said he and Person were sitting down when the shooters approached.

g. That Murphy initially said he could not see the shooters because it was "kinda dark."

h. That Murphy said that as shots were fired he ran into the middle of the Evergreen Regency complex, which is at the intersection where Person was killed.

i. Other exculpatory or impeachment evidence to be learned during discovery.

65.     As set forth above, Gaspar knowingly violated her duty to disclose to prosecutors all material evidence and its exculpatory and impeachment value were apparent.

66.     The material identified above was favorable to Christian because it was exculpatory or impeaching, and Gaspar suppressed it.

67.     Gaspar willfully and intentionally suppressed the October 16, 2007 transcript. Prejudice ensued because there is a reasonable probability that the suppressed evidence would have resulted in no charges being brought or produced a different verdict.

68.     The *Brady* violations committed by Gaspar resulted in Christian not receiving a fair trial, described as a trial resulting in a verdict worthy of confidence.

69.     Had Gaspar disclosed the *Brady* material, there would have been no arrest, much less a conviction. A re-trial that included the *Brady* evidence would have resulted in a directed verdict or acquittal.

70.     The *Brady* evidence referenced above would have been apparent to any reasonable officer acting in good faith.

71.     Christian's right to be provided with material exculpatory and impeachment evidence was clearly established long before Christian was investigated and arrested. *Jackson v. City of Cleveland*, 925 F.3d 793, 823 (6th Cir. 2019) (holding that in 1975, *Brady*-derived claims against police officers were clearly established).

WHEREFORE, Plaintiff requests the following relief:

  a. Compensatory non-economic and economic damages in excess of $75,000.00 including, but not limited to, all damages recoverable under the United States Constitution and/or 42 U.S.C. § 1983 and/or the laws of the State of Michigan;

      b.  Punitive damages;

      c.  Reasonable attorney fees under 42 U.S.C. § 1988, costs, and interest; and,

      d.  Such other and further relief as appears reasonable and just under the circumstances.

## COUNT II

### Fabrication of Evidence

**Against Gaspar**
**In Violation of the Fourth and Fourteenth Amendments,**
**Cognizable Under 42 U.S.C. § 1983**

72.    Plaintiff restates and realleges the allegations contained in the above paragraphs as though fully set forth herein.

73.    The Fourth Amendment is violated, "where a defendant *knowingly* manufactures probable cause, thereby effecting a seizure." *Robertson v. Lucas*, 753 F.3d 606, 616 n.5 (6th Cir. 2014) (emphasis added).

74.    The Due Process Clause of the Fourteenth Amendment is violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury. *Gregory v. Louisville*, 444 F.3d 725, 737 (6th Cir. 2006).

75.    Defendant Gaspar violated Christian's Fourth and Fourteenth Amendment rights and deliberately fabricated evidence in the following ways:

      a.  By misstating Murphy's timeline by writing in her summary

that Murphy said the shooting happened at 8:00 p.m., which is what he said in November—but not what he said in October, which was 9:00 p.m. or 9:30 p.m.

b.  By falsely writing in her summary that Murphy told her that one of the men accused Person of snitching on a brother, which is what he said in November—but not what he said in October, which was that one of the men accused Person of snitching on his mom.

c.  By intentionally omitting in her summary that in October Murphy said that one of the shooters was on a bicycle and Person was not riding a bicycle.

d.  By intentionally omitting in her summary that in October Murphy said that a girl was with him when the shooting happened.

e.  By intentionally omitting in her summary that in October Murphy said they were sitting on the sidewalk at the time of the shooting.

f.  By intentionally omitting in her summary that in October Murphy said that he could not see the shooters because it was "kinda dark."

g.  By intentionally omitting in her summary that in October Murphy said that he fled to the middle of the Evergreen Regency Apartments after shots were fired.

h.  Other fabrications and intentional omissions to be learned during discovery.

76.  Gaspar knowingly fabricated the above-referenced evidence, and there is a reasonable likelihood that the false evidence would have affected the jury's decision.

77.  Gaspar deliberately fabricated the above-referenced evidence to

18

criminally charge, arrest, prosecute, detain, and convict Christian.

78.     At all times relevant, Gaspar influenced the initiation of criminal prosecution when she deliberately and knowingly fabricated evidence by writing a false and misleading summary of Murphy's October interview, which was material to a finding of probable cause.

79.     But for Gaspar's fabrication of evidence, probable cause would have been lacking. Gaspar's fabrication of probable cause cannot be immunized by later providing false testimony. *See, Alioto, v. City of Shively,* 835 F.2d 1173, 1174 (6th Cir. 1987) (the doctrine of absolute or qualified immunity does not protect an official accused of falsifying evidence or even conspiring to falsify evidence).

80.     Gaspar continued her investigation even though she knew Christian was innocent or was deliberately indifferent to his innocence, and the results of the investigation were used to criminally charge, arrest, prosecute, detain, and convict Christian.

81.     Gaspar used investigative techniques so coercive and abusive that she knew, or was deliberately indifferent to, whether those techniques would yield false information used to criminally charge, arrest, prosecute, detain, and convict Christian.

82.     At all times relevant, it was clearly established that knowingly fabricated evidence used to manufacture probable cause for a seizure or conviction

violated an individual's constitutional rights under the Fourth and Fourteenth Amendments. *Jackson*, 925 F.3d at 826 ("The reasoning in *Spurlock* is sound, and we follow it in holding that Stoiker was on notice in 1975 that it was unlawful for him to fabricate evidence.") (citing *Spurlock v. Satterfield*, 167 F.3d 995, 1005-06 (6th Cir. 1999)).

WHEREFORE, Plaintiff requests the following relief:

a. Compensatory non-economic and economic damages in excess of $75,000.00 including, but not limited to, all damages recoverable under the United States Constitution and/or 42 U.S.C. § 1983 and/or the laws of the State of Michigan;

b. Punitive damages;

c. Reasonable attorney fees under 42 U.S.C. § 1988, costs, and interest; and,

d. Such other and further relief as appears reasonable and just under the circumstances.

## COUNT III

### Wrongful Institution of Legal Process – Malicious Prosecution

**Against Gaspar
In Violation of the Fourth Amendment,
Cognizable Under 42 U.S.C. § 1983**

83.    Plaintiff restates and realleges the allegations contained in the above paragraphs as though fully set forth herein.

84.    Christian had a constitutional right, guaranteed by the Fourth

Amendment, to be free of illegal seizure and detention without probable cause, based on false statements and/or material omissions that were knowingly or recklessly made to manufacture probable cause.

85.     As an investigator and officer in charge, Defendant Gaspar had a duty to make truthful statements to the prosecutor and district court judge to establish probable cause for an arrest warrant.

86.     Gaspar influenced Christian's criminal prosecution by deliberately and knowingly supplying false information and omitting material information, as set forth above, which showed a reckless disregard for the truth in requesting an arrest warrant and swearing to facts in support of probable cause, which was material to a finding of probable cause.

87.     Through the false statements and material omissions identified above, and by concocting the false narrative that Murphy witnessed the shooting, Gaspar caused Christian to be falsely arrested, maliciously prosecuted, convicted and incarcerated, in violation of his constitutional rights.

88.     At all times relevant, Christian's right not to be seized and continuously detained without probable cause, based upon a police officer's deliberate and knowing fabrication of evidence and false statements and material omissions to prosecutors and magistrate judges was clearly established before Christian was arrested. *Jackson*, 925 F.3d at 825 ("The obvious injustice inherent in fabricating

evidence to convict three innocent men of a capital offense put [the officer] on notice that his conduct was unlawful.")

WHEREFORE, Plaintiff requests the following relief:

a. Compensatory non-economic and economic damages in excess of $75,000.00 including, but not limited to, all damages recoverable under the United States Constitution and/or 42 U.S.C. § 1983 and/or the laws of the State of Michigan;

b. Punitive damages;

c. Reasonable attorney fees under 42 U.S.C. § 1988, costs, and interest; and,

d. Such other and further relief as appears reasonable and just under the circumstances.

## COUNT IV

### Continued Detention without Probable Cause

**Against Gaspar
In Violation of the Fourth Amendment,
Cognizable Under 42 U.S.C. § 1983**

89.    Plaintiff restates and realleges the allegations contained in the above paragraphs as though fully set forth herein.

90.    Christian had a constitutional right, guaranteed by the Fourth Amendment, to be free of continued detention without probable cause.

91.    As an investigative official, Gaspar had a duty to refrain from engaging in acts that continued Christian's detention without probable cause.

22

92.     At all times relevant, Gaspar perpetuated Christian's continued detention when it was in their power to dissolve probable cause.

93.     Gaspar specifically influenced Christian's continued detention by fabricating her police narrative report and by knowingly failing to disclose *Brady* material before and after Christian's conviction.

94.     Gaspar knew the evidence used to detain Christian was fabricated and/or concealed.

95.     Beginning November 9, 2007, Christian's detention was unlawfully continued due to Gaspar's failure to disclose the exculpatory and impeachment evidence identified above and Christian's right to a fair trial was abridged.

96.     Had Gaspar not fabricated or withheld evidence there would have been no probable cause for Christian's continued detention.

97.     Had Gaspar not unlawfully suppressed the October transcript, probable cause for Christian's continued detention would have been eliminated.

98.     At all times relevant, Gaspar influenced or participated in Christian's detention by deliberately and knowingly supplying false information and omitting material information that showed a reckless disregard for the truth.

99.     Through the false statements and material omissions identified above, Gaspar caused Christian to be continuously detained, day by day and year by year, from November 9, 2007, to September 23, 2022.

100.   At all times relevant, Christian's right to be free of continued detention without probable cause was clearly established long before November 9, 2007.

WHEREFORE, Plaintiff requests the following relief:

a.   Compensatory non-economic and economic damages in excess of $75,000.00 including, but not limited to, all damages recoverable under the United States Constitution and/or 42 U.S.C. § 1983 and/or the laws of the State of Michigan;

b.   Punitive damages;

c.   Reasonable attorney fees under 42 U.S.C. § 1988, costs, and interest; and,

d.   Such other and further relief as appears reasonable and just under the circumstances.

## COUNT V

### Unduly Suggestive Witness Identification Procedures

**Against Gaspar
In Violation of the Sixth and Fourteenth Amendments,
Cognizable Under 42 U.S.C. § 1983**

101.   Plaintiff restates and realleges the allegations contained in the above paragraphs as though fully set forth herein.

102.   Christian had a constitutional right, guaranteed by the Sixth Amendment, to be free of police officers using unduly suggestive and unnecessary witness identification procedures to manufacture identification of suspects in a crime.

103.    Gaspar designed the illegal witness identification procedure to increase the chance of false identification and to manufacture probable causes for an arrest and prosecution.

104.    Gaspar's witness identification procedure violated Plaintiff's right to due process and a fair trial and resulted in them not receiving a fair trial.

105.    More specifically, following her November 8, 2007 interview with Murphy, Gaspar had Murphy view three sequential photo arrays containing Joshun Edwards, Dartanion Edwards, and Christian.

106.    Gaspar intentionally placed the photographs of these men in the top middle position, thereby skewing the identification process to facilitate Murphy's identification of Christian and the Edwards brothers as the suspects.

107.    Gaspar further skewed the process by telling Murphy that the suspects were in the photo array and to be careful with his picks because undercover officers were included as fillers in the lineups.

108.    Gaspar also let out an audible "sigh" when Murphy initially chose someone who was not her intended target and asked, "Are you sure?" after an incorrect pick.

109.    These cues were unduly suggestive and improperly influenced Murphy to select Christian and the other suspects in the photo arrays.

110.    Gaspar never showed Murphy a photo array or in-person lineup

containing other known suspects.

111.   Murphy "made up" the descriptions of the shooters. This would have been evident to any reasonable officer.

112.   Murphy's identification of Christian in the photo array was used as probable cause for his arrest, which APA Karen Hanson recommended.

113.   Plaintiff's right to be free from an identification that was unduly suggestive and unnecessary was clearly established long before 2007. *Moore v. Illinois*, 434 U.S. 220, 227; 98 S.Ct. 458 (1977) ("Due process protects criminal defendants against the introduction of evidence of, or tainted by, unreliable pretrial identifications obtained through unnecessarily suggestive procedures.").

WHEREFORE, Plaintiff requests the following relief:

a. Compensatory non-economic and economic damages in excess of $75,000.00 including, but not limited to, all damages recoverable under the United States Constitution and/or 42 U.S.C. § 1983 and/or the laws of the State of Michigan;

b. Punitive damages;

c. Reasonable attorney fees under 42 U.S.C. § 1988, costs, and interest; and

d. Such other and further relief as appears reasonable and just under the circumstances.

## COUNT VI

## Failure to Train – *Monell* violation

**Against the City of Flint**
**In Violation of the Fourth and Fourteenth Amendments,**
**Cognizable Under 42 U.S.C. § 1983**

114.    Plaintiff restates and realleges the allegations contained in the above paragraphs as though fully set forth herein.

115.    The City of Flint may be liable under section 1983 for constitutional violations arising from its failure to train its employees properly.

116.    At all times relevant, Flint was on actual or constructive notice that officers were fabricating and withholding evidence.

117.    Flint knew that people were being arrested for and convicted of crimes they did not commit based on its detectives fabricating evidence or withholding *Brady* material.

118.    At all times relevant, Flint failed to train detectives on properly handling exculpatory and impeachment evidence.

119.    At all times relevant, Flint failed to train officers of their constitutional obligations not to fabricate evidence and to affirmatively disclose and produce exculpatory and impeachment evidence to people accused of crimes.

120.    For years, Flint tolerated constitutional violations under *Brady,* enabling detectives to arrest and convict people in violation of their constitutional rights.

121.    Flint had a policy of inadequate training or supervision of its officers as

27

to their obligation to disclose exculpatory and impeachment evidence under *Brady* such that officers were trained to withhold exculpatory and impeachment evidence.

122.   The failure of Flint to provide adequate training and supervision to investigators is shown through a pattern of similar constitutional violations by officers in the Flint Police Department and its adherence to an approach that it knew failed to prevent tortious conduct by officers, or in the alternative, failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation.

123.   Flint's training program was inadequate for the tasks investigators must perform; the inadequacy was the result of Flint's deliberate indifference, and the inadequacy was closely related to or actually caused Christian's injuries.

124.   The failure of Flint to implement different or additional training for its officers was so apparent that its failure to do so is properly characterized as deliberate indifference to Christian's constitutional rights.

125.   The failure of Flint to adequately train its officers was the moving force of Christian's arrest and wrongful conviction.

126.   As a direct and proximate result of Flint's failure to train and deliberate indifference, Christian was charged with crimes he did not commit, deprived of his liberty, and wrongfully convicted and imprisoned, causing him to suffer the injuries and damages set forth throughout this Complaint.

WHEREFORE, Plaintiff requests the following relief:

    a.  Compensatory non-economic and economic damages in excess of $75,000.00 including, but not limited to, all damages recoverable under the United States Constitution and/or 42 U.S.C. § 1983 and/or the laws of the State of Michigan;

    b.  Punitive damages;

    c.  Reasonable attorney fees under 42 U.S.C. § 1988, costs, and interest; and,

    d.  Such other and further relief as appears reasonable and just under the circumstances.

### STATE LAW CLAIM

### COUNT VII

### Malicious Prosecution
### Against Gaspar

127.  Plaintiff restates and realleges the allegations contained in the above paragraphs as though fully set forth herein.

128.  Gaspar had a duty not to subject Christian to unreasonable searches and seizures.

129.  Gaspar had a duty not to, for vexation or malicious purpose, cause Christian to be arrested or in any way prosecuted without his consent or without probable cause.

130.  Gaspar vexatiously or maliciously caused or continued Christian's

prosecution without his consent or without probable cause.

131.   Gaspar initiated and/or enabled and/or supported by, among other things, the perpetuation of falsehood and the aforementioned criminal prosecution of Christian without probable cause.

132.   Due to the criminal prosecution initiated and/or enabled and/or supported by Gaspar, Christian suffered an unreasonable and unconstitutional seizure and deprivation of liberty and damages related to his unlawful confinement.

133.   The criminal proceedings were resolved in Christian's favor when his convictions were vacated and/or when he was no longer incarcerated for those convictions.

134.   Gaspar did not have probable cause for initiating or continuing Christian's criminal proceedings.

135.   Gaspar initiated or continued Christian's criminal proceedings with malice or a primary purpose other than bringing the offender to justice.

136.   But for Gaspar's fabrication of Murphy's statements and misleading summary of Murphy's statements, probable cause to arrest or detain Christian would have been lacking.

137.   As a direct and proximate result of the foregoing actions, Plaintiff has suffered the following injuries, among others:

      a.  Seizure and repeated and prolonged loss of liberty;

b. Loss of wages, earnings, and gifts;

c. Degradation, humiliation, mental anguish, emotional suffering, embarrassment and other psychological and emotional injuries, past and future;

d. Loss of and damage to his reputation;

e. Loss of society and companionship; and,

f. Treble damages under M.C.L. § 600.2907.

Respectfully submitted,

LAW OFFICE OF MICHAEL R. DEZSI, PLLC

Dated: August 5, 2024        /s/ *Michael R. Dezsi*
                             Michael R. Dezsi (P64530)
                             Attorney for Plaintiff
                             1523 N. Main St.
                             Royal Oak, MI 48067
                             (313) 757-8112
                             mdezsi@dezsilaw.com

GARRISON LAW, PC

TREVOR B. GARRISON (P69255)
Attorney for Plaintiff
1523 N. Main St.
Royal Oak, MI 48067
(248) 847-1000
tgarrison@garrison-law.com

## <u>DEMAND FOR TRIAL BY JURY</u>

NOW COMES Plaintiff, by and through his counsel and hereby demands a trial by jury as to all those issues so triable as of right.


Respectfully submitted,

LAW OFFICE OF MICHAEL R. DEZSI, PLLC

Dated: August 5, 2024          /s/ *Michael R. Dezsi*
                                             Michael R. Dezsi (P64530)
                                             Attorney for Plaintiff
                                             1523 N. Main St.
                                             Royal Oak, MI 48067
                                             (313) 757-8112
                                             mdezsi@dezsilaw.com


GARRISON LAW, PC

TREVOR B. GARRISON (P69255)
Attorney for Plaintiff
1523 N. Main St.
Royal Oak, MI 48067
(248) 847-1000
tgarrison@garrison-law.com